BLAKEMAN *v.* HARWELL, executor, *et al.*

166

No. 14915.　July 7, 1944.　Rehearing denied July 21, 1944.

170

*Marvin G. Russell* and *Earl Sims,* for plaintiff in error.

*Crenshaw, Hansell & Gunby, Spalding, Sibley & Troutman, Douglas, Evans & Cole* and *Durwood T. Pye,* contra.

GRICE, Justice. ■ The Scottish Rite Hospital for Crippled Children, a corporation, is a party to this case, is a legatee under the will, and is directly and substantially interested ·in the outcome of the litigation. Counsel for the plaintiff in error, in a motion reciting that the hospital is controlled and partly supported by the fraternal order known as Scottish Rite Masons, suggests that under such circumstances, any Justice of this court "who is a Scottish Rite Mason, or a Mason according to any other rite or degree whatever, is disqualified by interest and ought not to sit in the cause." To this motion counsel for the hospital filed a response, which was sworn to and served upon opposite counsel. In said response it was averred, among other things, that the hospital was a corporation operated exclusively for charitable purposes; that no individual does or can derive any gain or profit through said operation; that it is supported exclusively by donations; that no person is under any obligation to contribute thereto, except by his own volition; that no Mason, whether a member of the Scottish Rite bodies or not, is bound to pay or contribute anything to its

support, except by an individual subscription or contribution; and that no Masonic body or organization is bound to make any contribution to or pay any obligation or debt of said corporation. As further alleged, all property of the corporation is owned by it. No person, be he Mason or not, and no Masonic body, has any interest, direct or indirect, in the property of said corporation. Its management is in a board of trustees composed of twenty-five persons. A majority of said board, consisting of members in good standing, are selected by such bodies. The remaining members of the board are elected by the members thereof. Such remaining members need not be members of the Scottish Rite bodies, and actually some of them are not Masons.

Counsel for the movant were requested to make reply to the response and either to affirm or disaffirm the facts stated therein; and if the movant claimed that the facts set forth in said response were incorrect either in whole or in part, then it was requested that the movant acquaint the court with specific facts, if any, to show disqualification; the Justices not being aware of any facts that would show any of them to be pecuniarily interested in the litigation, or of any other facts that would justify them in disqualifying for any reason set forth in the original motion. In response to this request, counsel filed an amended motion to disqualify, which did not take issue with any fact stated in the response, but reiterated the insistence that any Justice who is a Mason should not participate in the decision of the case, and contained the further statement "that a greatly preponderant majority, and perhaps totality, of the Justices of this court pay regular dues to the Masonic order and are members thereof in good standing." As a matter of fact five of the six members of this court belong to the Masonic fraternity. None are Scottish Rite Masons.

The first assignment of error concerns a related question, which is as follows: When the case was sounded, counsel for Eva Newby Blakeman suggested the disqualification of the judge, under the following facts and circumstances, which were undisputed and admitted. (a) That The Scottish Rite Hospital for Crippled Children was a legatee under the will, with an interest of a pecuniary nature in the outcome of the litigation; (b) That this interest was based on the will and on the terms of a settlement said hospital had

made with Edward Clyde Blakeman, a legatee; (c) That said institution was controlled, and partly supported by the fraternal order known as Scottish Rite Masons; (d) That the presiding judge, the Honorable Paul S. Etheridge, paid dues to that order and was a member thereof in good standing. The judge ruled that these uncontroverted facts did not constitute a legal disqualification, and proceeded to hear the cause.

"From the earliest times it has been held that the requirement of impartiality disqualifies a judge from acting in a case in which he has an interest. Though it has been held that the disqualifying interest may be a personal one to the judge, the general rule is that it must be pecuniary in nature, and not remote, uncertain, speculative or merely incidental; and several cases emphasize the distinction between a property interest and such interest as results from a feeling of sympathy or bias that would disqualify a juror." 15 R. C. L. 528, 529, § 17. "The interest which disqualifies a judge is a direct pecuniary, or direct property interest, or one which involves some individual right or privilege, in the subject-matter of the litigation, whereby a liability or pecuniary gain must occur on the event of the suit." 33 C. J. 992, § 135. "A judge is not per se disqualified to try a cause one of the parties to which is a church, lodge, or society of which he is a member." 30 Am. Jur. 777, § 65. In Tucker *v.* Houston, 216 Ala. 43 (112 So. 360), in a contest as to whether a will should be probated, Birmingham-Southern College, a Methodist institution, was named as residuary legatee, making it the largest beneficiary under the will. The reported facts do not reveal just what was the relationship of the Methodist Church to the college. On the trial of the case it was sought to challenge a number of jurors on the ground that they were members of the Methodist Church. The holding of the court was that as members of the Methodist Church, these jurors had no pecuniary interest in the issues involved, and that the trial court properly overruled the objections thereto. In the case of Ex parte Alabama State Bar Association, 92 Ala. 113 (8 So. 768, 12 L. R. A. 134), the same court held that membership in a State bar association does not disqualify a judge to hear a proceeding brought by it for the disbarment of an attorney, although the association may be liable for the costs if defeated. Burdine *v.* Grand Lodge, 37 Ala. 478,

was an action brought by the "Most Worshipful Grand Lodge of Ancient Free Masons of Alabama and its Masonic Jurisdiction" against James T. Burdine. Objections were offered to several jurors, apparently on the ground that they belonged to the Society of Free Masons, and similar objections were offered to the competency of a witness, on the ground that he, who was also a Mason, was interested. It was ruled that the several objections to the jurors and the witness were properly overruled by the trial court. This conclusion was reached on the ground that the court would take judicial notice that the Grand Lodge and subordinate lodges of Free Masons within the State of Alabama constituted a charitable or eleemosynary corporation, and that it could not be said that any of the members had any pecuniary interest in the result of the suit. "In order to disqualify a judge, there must exist a ground authorized by law to disqualify him; it is not for the courts to add other grounds of disqualification." 33 C. J. 991, § 133.

There is a Georgia statute which declares when a judge or justice is disqualified. Code, § 24-102. The interest which by our Code will disqualify is a pecuniary interest. "No judge or justice . . shall sit in any cause or proceeding in which he is pecuniarily interested," is the language. Both the Court of Appeals of this State and this court have held that the statutory grounds of disqualification contained in this section are exhaustive. *Luke* v. *Batts,* 11 *Ga. App.* 783 (3) (76 S. E. 165); *Carson* v. *Blair,* 31 *Ga. App.* 60 (121 S. E. 517); *Scott* v. *State,* 53 *Ga. App.* 61 (185 S. E. 131); *De Krasner* v. *Boykin,* 54 *Ga. App.* 38 (186 S. E. 749); *Elliott* v. *Hipp,* 134 *Ga.* 844, 848 (68 S. E. 736, 137 Am. St. R. 272, 20 Ann. Cas. 423); *Moore* v. *Dugas,* 166 *Ga.* 493 (4) (143 S. E. 591); *Riner* v. *Flanders,* 173 *Ga.* 43 (4), 45 (159 S. E. 693); *Elder* v. *Camp,* 193 *Ga.* 320 (18 S. E. 2d, 622).

The motion to disqualify certain Justices of this court is overruled. The first assignment of error, relating as it does to the alleged disqualification of the trial judge, is without merit.

▮ The plaintiff in error excepts to the refusal of the court to compel the production of two documents which embodied the terms of a settlement between Edward Clyde Blakeman and The Scottish Rite Hospital for Crippled Children. An agreement of settlement, whatever it was or would have been shown, between two

named legatees could have no possible relevancy on any issue here involved. The court had before it an executor's equitable petition for direction, and asking that certain portions of the will be construed. That the respective rights and conflicting interests of two of the several legatees had been agreed upon, as between themselves, could not have aided the court in the matter with which it had to deal. There was no error in the ruling complained of.

■ In item 6 of the will, the home place was devised absolutely to Edward Clyde Blakeman and Eva Newby Blakeman. However, in the latter part of said item, it was provided that, "It is not to be disposed of for ten years after my death, at which time my executors may turn over the house and lot to my son and daughter-in-law, with an equal interest, to be used or disposed of as they may see fit." The two legatees named were the son and daughter-in-law of the testatrix. In the executor's petition, he averred that both were of full age and resting under no disability; and prayed that he be advised whether or not the restriction against alienation for ten years being a restriction upon the grant of an absolute fee, was valid. Mrs. Eva Newby Blakeman, in her response to the petition for direction, took the position that in item 6 an absolute estate in fee simple was given to her and her husband jointly, freed of all limitations and conditions, except that the estate granted is terminable under item 7 in the event both devisees meet a tragic or instant death before the personal representative of the estate has assented to the devise or closed the administration. The judge held in his decree that the son and daughter-in-law took a fee-simple estate therein jointly, and therefore that the restriction against alienation for ten years is repugnant to the estate granted, void, and of no effect. Although in her favor, nevertheless she excepts to the ruling, and insists that it is contrary to law, because the court made no reference to item 7, which she insists is inseparable from item 6. It was not suggested in the petition, nor in any of the answers filed, that item 7 needed construction; and when the court held that under item 6, she took with her husband jointly a fee-simple estate in the property there devised, she has no reason now to complain that, in construing item 6, no mention was made of item 7.

■ The sixth paragraph of the decree defines the interest which the hospital has in the estate of the testatrix. This is excepted to,

"because it wholly fails to take into account the settlement between Edward Clyde Blakeman and said Scottish Rite Hospital," etc. The exception is without merit.

■ The seventh paragraph of the decree holds that the will fails to make disposition of any of the residue of the estate which may remain upon the death of Eva Newby Blakeman or Edward Clyde Blakeman, occurring after the latter has attained sixty years, and therefore that in case of such an eventuality, an intestacy would result with respect to said residuum. Whether this construction be erroneous or not—and we are not to be understood as intimating that it was not correct—is of no concern to the plaintiff in error. She takes nothing by inheritance. Her rights come to her by the will itself. She has no interest in the court's construction of that item as to what would happen in the event of a certain contingency. It is purely a theoretical question of law. Still another exception is to the failure of the court to direct the executor to close the estate as of June 15, 1949, the date when Edward Clyde Blakeman will become sixty years of age, if the said Blakeman and his wife are still in life at that time. As to that, the plaintiff in error has no right to complain. It is a matter which does not concern her, and therefore, she will not be heard to question the ruling.

■ ■ In what sense did the testatrix use the words "my personal property," found in item 5 of the will? That item reads as follows: "It is my will that my personal property be divided equally between Eva Newby Blakeman and my son, Edward Clyde Blakeman, to be used jointly or to be disposed of whenever they so desire."

Courts have frequently held that the words "personal property" are susceptible of two meanings: one, the broader, including everything which is the subject of ownership, except lands and interest in lands; the other, more restricted, oftentimes embracing only goods and chattels. In ascertaining from the entire will, and the surrounding circumstances, what the intention of the testator was by the use thereof, it has not infrequently been ruled that the term "personal property" did not include money, notes, and choses in action. Bryant v. Bryant, 129 Me. 251 (151 Atl. 429); Bills v. Putnam, 64 N. H. 554 (15 Atl. 138); Andrews v. Schoppe, 84 Me. 170 (24 Atl. 805); In re Combs' Estate, 136 Cal. App. 286

(28 Pac. 2d, 711) ; In re Cowden's Estate, 10 Cal. App. 2d, 481
(51 Pac. 2d, 1165) ; Bond v. Martin (Ky.), 76 S. W. 326; Stender
v. Stender, 181 Mich. 648 (148 N. W. 255) ; In re Moore's Estate,
241 Pa. 253 (88 Atl. 432) ; Southington Bank v. American Baptist
Home Mission, 96 Conn. 107 (113 Atl. 166).

It was said in Bills v. Putnam, supra, that it is at least doubt-
ful whether the term "personal property" is generally understood
to include money, notes, and choses in action, and that in its popu-
lar meaning it is commonly applied to goods and chattels. Sev-
eral of the cases cited above discuss the reason for the holding that
in some instances those words should not be construed to include
money, stocks, and bonds, and similar intangibles. If to give it
the more restricted meaning would give effect to all the provisions
of the will, such rendition will be adopted; if, to give it the broader
meaning, other items of the will would be impossible of execution.
In *Welman* v. *Neufville,* 75 *Ga.* 124, this court, in affirming a case
from Chatham superior court, adopted a written opinion of the
trial judge, saying that the question raised as to the proper con-
struction of the will there involved had been so satisfactorily deter-
mined by the trial judge that any addition thereto would be
superfluous. It was in that case ruled that the words "personal
effects," as used in a bequest, were "intended only to cover and
convey articles of slight value having a value derived chiefly from
association and personal use," and were not intended to operate on
the remainder of a valuable estate, which went under a residuary
clause to a certain church. See also *Mathis* v. *Causey,* 172 *Ga.*
868 (159 S. E. 240, 75 A. L. R. 111). In *West* v. *Randle,* 79 *Ga.*
28 (3 S. E. 454), it was held that the words "all the property,"
contained in item 14 of a will were to be taken in a restricted sense,
so as to exclude certain property specifically devised in item 12 of
the same will. One reason given for the ruling was that the court
was bound to seek the testator's intention by looking to the whole
will, and if possible to render the whole instrument operative.

Having demonstrated that the words, "my personal property," do
not necessarily mean intangibles also, we have but to apply a few
well-known rules to the will itself, in the light of the surrounding
circumstances, to be satisfied that as here used they were intended
in a restricted sense, and that the trial court correctly decreed that
they were used by the testatrix in the sense of tangible personal

property. The intention of the testator is to be sought by looking to the whole will, and not to detached parts of it. *Cook* v. *Weaver*, 12 *Ga.* 47. Effect should be given to the entire will and to every part of it, if possible. *Brown* v. *Weaver*, 28 *Ga.* 377; *Rogers* v. *Highnote*, 126 *Ga.* 740 (56 S. E. 93). All the provisions of the instrument will be harmonized wherever possible so as to give effect to every provision therein. *Robertson* v. *Johnston*, 24 *Ga.* 102; *Tyler* v. *Theilig*, 124 *Ga.* 204, 207 (52 S. E. 606). As an aid to construction, it is proper to look to the circumstances surrounding the testatrix at the time of the execution of the will. Code, § 113-807; *Watts* v. *Finley*, 187 *Ga.* 629 (1 S. E. 2d, 723). What does the record show as to the situation of the testatrix, of her family, her property, and the legatees?

The testatrix was a widow for many years before her death. She had one child, Edward Clyde Blakeman. He is 54 years old and married, his wife being 54 years old. There are no children as the result of this marriage. Her property consisted of a house and lot, known as No. 929 Myrtle Street, N. E., Atlanta, Georgia; an automobile, jewelry, clothing, wearing apparel, and other tangible personal property of similar kind but of no substantial value; cash on deposit in savings account and in cash $3988.70; postal savings certificates in the amount of $2500; 100 shares of common stock of Coca-Cola International Corporation; and 50 shares of Class-A stock of the same corporation. The Coca-Cola stock was of the value of approximately $90,000. Both before her husband's death and for a number of years thereafter, Thomas K. Glenn and his family lived on Myrtle Street, next door to the testatrix. He had two sons, who were small boys when their mother died. Thereafter, these two sons of Thomas K. Glenn were almost daily visitors in the home of the testatrix. Both Thomas K. Glenn and his sons have for a long number of years been patrons of and contributors to The Scottish Rite Hospital for Crippled Children. For a number of years Thomas K. Glenn was president of its board of trustees. A very close friend of the Glenn family and the constant companion of the two Glenn boys was Eugene Gunby, a lawyer, who prepared the will at the request of the testatrix. When he was quite a little boy, Gunby, then living in Lincoln County, Georgia, was a patient of said hospital; and by reason of the treatment received there, he was greatly improved and enabled to

walk erect with the aid of crutches for the first time since he was a tiny child. The testatrix knew of his case, and of the benefit which he had received from the treatment at the hospital. She first met Mr. Gunby when he was a patient in said hospital. In company with the Glenn boys, and alone, Mr. Gunby visited the testatrix on many occasions. On advice of and with the backing of Thomas K. Glenn, the testatrix borrowed $2000 from the Trust Company of Georgia, and invested that amount in Coca-Cola stock. Thereafter the loan was paid off out of the profits of said investment. The Coca-Cola stock in the present estate is the result of said original fortunate investment. As a result, the testatrix received an income of from $3000 to $4000 a year over a long period of time before her death. During the last five years of her life, said income was not less than $3000, and in some years was in excess of $4000. The cash and postal savings certificates owned by the testatrix were savings out of the income from her Coca-Cola holdings. She had no other income, except the dividends from the aforesaid corporate stocks and the interest on the postal savings certificates. The friendship between the testatrix, the said Eugene Gunby, and the sons of Thomas K. Glenn continued until the death of the testatrix. They visited her frequently.

Let the will be next examined in order to ascertain whether, if the plaintiff in error's contention be sound, the several other purposes of the testatrix, as expressed in other items of the will, are at best but empty gestures; and to submit the inquiry, how, if, under item 5, "my personal property" was intended to include the cash, certificates of indebtedness, and shares of stock above noted, would it be possible to carry out a number of the other provisions of the will? The will contained fifteen items. Six of these related only to administrative directions. Nine of them undertook to dispose of the property of the testatrix. Of these nine items, two of them dealt with real estate, item 6 devising the home on Myrtle Street to her son and daughter-in-law jointly, and item 7 undertaking to give the executors power to dispose of the same in a certain contingency. Seven items related to or affected the personal property. Item 3 left to the son $50 per month, and the sum of $5000 when he arrived at the age of 60, and $10,000 when he reached 70. Item 4 gave to the plaintiff in error, the daughter-in-law, $50 per month, with certain rights of encroachment for her support in case

of emergency. Thus the will bequeathed a minimum of $100 a month to the son and daughter-in-law, to which must be added $5000 to be paid to the son at 60, and $10,000 at 70—a total of $15,000; and whatever sum the executors saw fit to increase the monthly stipend of $50 to the daughter-in-law. The will then proceeded to instruct the executors (item 8) to invest whatever excess income there might be from dividends or from any other source over the amount necessary to pay the monthly sums to the son of the testatrix and his wife; and, in item 9, to provide that, if the income was not sufficient to pay the monthly stipend, the executors were authorized to encroach on the corpus for that purpose. There was also, in item 3, an express desire that Coca-Cola stock remain intact and the income used, unless the executors deemed it advisable to dispose of the same; and an explicit direction that, after the payment of burial and incidental expenses, any cash money left was to be invested by the executors after a sufficient amount had been set aside to pay the monthly legacies. In item 10, the testatrix made a contingent bequest of a life-estate "in the remainder of said stock" to her brother and sisters, and directed that the pro rata part to be received by the brother be kept intact by her sisters, and that the income therefrom, or a part of the corpus, be paid to the brother as he might need it. Item 11 provided that, "Any residue or property left from this estate by my sisters and brother shall be given in fee simple to The Scottish Rite Hospital, to use as they see fit."

The foregoing analysis of the will has been set forth to show that, if the contention of the plaintiff in error prevails, to wit, that the words, "my personal property," as used in item 5 be construed to mean other than tangible personal property, then a number of other provisions are rendered unenforceable. Such a meaning, given to those words, would throw the entire will out of joint, while to give them the more restricted one would harmonize the whole.

The trial judge correctly construed the will. We find no error in the decree complained of.

*Judgment affirmed. All the Justices concur.*